IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | |
|---|---|
| ALETA MIXON, *Individually and as Administrator of the Estate of deceased* WYMAN LEE MIXON, | : : : : |
| Plaintiff, | : : |
| v. | : Case No. 1:11-cv-161 (WLS) |
| UNITED STATES OF AMERICA, | : : : |
| Defendant. | : : |

## BENCH OPINION

This civil case is before the Court for findings of fact and conclusions of law following a bench trial. After a review of the evidence and briefing, the Court enters judgment in favor of Plaintiff in the amount of $1.2 million.

### I.   PROCEDURAL BACKGROUND

Plaintiff Aleta Mixon (hereinafter "Plaintiff"), individually and as administrator of the estate of Wyman Lee Mixon, brought suit against the United States of America under the Federal Tort Claims Act after her husband, Wyman Mixon (hereinafter "Mixon"), died during post-operative recovery at the Charlie Norwood Veterans Affairs Medical Center in Augusta, Georgia. She claims the hospital's agents and employees caused her husband's death by negligently dispensing and monitoring pain medications. Plaintiff seeks damages for funeral expenses; for mental and physical pain and suffering; and for the full value of Mixon's life.

Before filing suit, Plaintiff presented a claim to Veteran's Affairs on a Standard Form 95. For the basis of the claim, she wrote, "claimant died as the result of excessive Dilaudid. See additional pages." An additional page stated:

> Claimant, Wyman Lee Mixon, was a veteran of the United States Military. On September 29, 2009, Mr. Mixon had cervical/spinal surgery at the Veterans Affairs Medical Facility, Augusta, Georgia. Around 1925 (7:25 p.m.), after a

1

successful surgery, Mr. Mixon complained of pain and was given between .5 milligrams and 1.0 milligrams of Dilaudid. Then around 2036 (8:36 p.m.), Mr. Mixon was given another 1.0 milligrams of Dilaudid. Approximately twenty minutes later Mr. Mixon was found unresponsive and although he was able to be resuscitated, his condition deteriorated and radiographic studies showed severe anoxic brain injury. Finally on October 2, 2009, life support care was removed and Mr. Mixon died.

The cause of Mr. Mixon's death is believed to have been an overdose of Dilaudid. One of the residents who is identified as Dr. Andrew Morgan made a note by addendum on October 16, 2009 indicating that he believed the cause of Mr. Mixon's death was an overdose of Dilaudid IV. In fact 1.0 milligrams of Dilaudid IVP every two hours was ordered as Mr. Mixon's pain medication; however, at the time of Mr. Mixon's arrest he had been given at least 1.5 milligrams of Dilaudid within Sixty-Three (63) minutes.

In the "Amount of Claim" section, Mixon wrote $5 million in the "Wrongful Death" box and left the "Property Damage" and "Personal Injury" boxes blank. She wrote $5 million as the total amount.

After filing her claim with the VA, Plaintiff timely filed suit on November 14, 2011. The Parties appeared for a pretrial conference September 11, 2013. At the conference, defense counsel requested an opportunity to brief jurisdictional issues regarding Plaintiff's theories of recovery. The jurisdictional issues primary involve 28 U.S.C. § 2675(a), which requires a plaintiff to first file a claim with the appropriate administrative agency. In its brief, the United States contends Plaintiff is limited to the theory in her Form 95—namely, that Mixon died from receiving 1.5 milligrams of Dialudid in 63 minutes. Per Defendant, this failure requires the Court to disregard Plaintiff's other theories of recovery, such as the failure to monitor Mixon and any recovery for pre-death pain and suffering. On a related issue, the United States seeks to exclude testimony from Plaintiff's expert witness, Dr. Charles Smith, because his opinion exceeds the content of the Form 95.

The Court held a bench trial on January 27 and 28 and allowed the parties to submit evidence and testimony and written arguments. Having reviewed the evidence and briefs in entirety, the Court now makes findings of fact and conclusions of law.

**II.     FACTUAL FINDINGS**

The Court makes the following findings of fact. In 2009, Wyman Mixon was a 69-year-old resident of Cordele, Georgia, who had recently retired from Tyson Foods as a wastewater engineer. He had been married to Aleta Mixon for about fifty years and had two sons and several grandchildren. Before Tyson Foods, Mixon worked a variety of jobs and served in the United States Marine Corps from 1957 to 1960. Since his retirement, he had received $1,535 in monthly Social Security income.

Mixon remained relatively active during his senior years. As a Freemason, he mentored young men at his Masonic Lodge, where, shortly before his death, he mowed the lawn. He attended parades and events with Shriners International. He hunted deer with family, attended cookouts, and watched his grandchildren play sports. Mixon also took care of his 94-year-old mother.

Despite those activities, Mixon suffered health problems. Medical records reflect he was alcohol dependent, although family members testified he had not drank in several years. He had diabetes, hypertension, hyperlipidemia, anemia, hearing loss, and osteoarthritis. Renal cancer left him with a single kidney. In addition, in 2007, Mixon began to experience severe neck pain and weakness in his arms. Because of that latter problem, Mixon visited the Dublin VA Medical Clinic to improve mobility. VA Doctors attributed his neck issues to spinal stenosis, for which they recommended a laminectomy and a fusion to decompress the stenosis.

Mixon agreed to the procedure. On September 29, 2009, he underwent surgery at the Charlie Norwood VA Medical Center (CNMC). During the surgery, he received pain medication and sedatives. The surgery was uneventful. After four hours in the operating room, Mixon was released to the post-anesthesia care unit (PACU), where he began receiving intravenously 0.2 to 0.4 milligrams of Dilaudid, the brand name for the synthetic opioid hydromorphone. Mixon's medical records reflect he was allergic to morphine, also of the opioid class, and codeine, and experienced nausea from these drugs. At around 1:10 p.m. on September 29, when his pain began to come under control, Mixon's blood oxygenation saturation dropped to 88 percent; his respiratory rate decreased to 8. These levels are considered

"alarming" and suggest Mixon was not receiving enough oxygen. There is no dispute that pain medications can decrease respiratory function, contributing to or resulting in oxygen desaturation. .

Around 3 p.m. that day, Mixon was transferred to a surgical floor, where a physician prescribed 0.5 milligrams of Dilaudid intravenously, as needed, not to exceed one dose every two hours. From 3 p.m. on September 29 to 11 a.m. on September 30, Mixon received seven 0.5 milligram doses of Dilaudid. Meanwhile, his pain scores fell from 10 to 6. At 11:39 on September 30, a doctor doubled Mixon's dosage to 1 milligram every two hours. He received 1 milligram at 1:02 p.m., reported a pain score of 6, and then received another milligram at 5:13 p.m. and reported a pain score of 5. Meanwhile, at about 7:25 p.m., Mixon received a dosage of Percocet, a pain medication that includes oxycodone and acetaminophen.

About an hour later, around 8:30, Mixon began to complain of pain and requested additional medication. Noting that Mixon looked pale, Annette El, a licensed practical nurse, gave him an incentive spirometer to improve respiratory function. He reported a pain score of 8. Shortly before, at 8:20 a.m., Mixon had registered a blood oxygenation level of 91 percent, a low level and a 5 percent decrease from his previous reading. Because blood oxygenation levels are evaluated on a "continuum," Mixon's lower reading would have warranted increased monitoring. At about 8:36 p.m., Keith Williams, a registered nurse, administered 1 milligram of Dilaudid. About thirty seconds after receiving that dose, Mixon reported a pain score of 1.

Thirty to forty-five minutes after his last dose of Dilaudid, Mixon was found unresponsive and in cardiac arrest. Medical personnel sounded an emergency signal. A doctor resuscitated Mixon through advanced cardiac life support. Once his vital signs returned to normal, he was transferred to the medical intensive care unit. But it became apparent by then that Mixon had suffered an anoxic brain injury and was not responding to stimuli. Physicians placed him on life support and gave him a poor prognosis for recovery. On October 2, Mixon's family decided to withdraw care. Without life support, Mixon failed to breathe on his own and died at around 2:06 a.m.

Shortly after Mixon's death, the family agreed to release his body to a funeral home, which promptly embalmed it. Nevertheless, Mixon's family obtained a post-embalming autopsy to determine the cause of death. Although the autopsy was of limited value because of the embalming, the forensic pathologist did not record evidence of a pulmonary embolism, one of the common causes of death in post-operative patients.

### III. DISCUSSION

#### A. Jurisdictional Issues

Before turning to liability, the Court must address the United States' jurisdiction challenges. The United States argues the Court cannot consider a number of Plaintiff's theories and causes of action because she failed to provide proper notice to Veteran's Affairs. In particular, the United States asserts the Court lacks jurisdiction over Plaintiff's pre-death pain and suffering claim and any theory of wrongful death beyond the administration of a certain dose of Dilaudid. This argument is premised on 28 U.S.C. Section 2675(a), which requires a plaintiff suing the United States under the FTCA to first present her claim to the appropriate federal agency and wait for a final decision. § 2675(a). Because of that statute, an FTCA suit "can be based on particular facts and theories of liability only when those facts and theories can be considered part of the plaintiff's administrative claim." *Rise v. United States*, 630 F.2d 1068, 1071 (5th Cir. 1980). The Court lacks jurisdiction to consider any improperly noticed claim. *Lykins v. Pointer, Inc.*, 725 F.2d 645, 646 (11th Cir. 1984).

To satisfy Section 2675(a), a claimant must (1) give the agency written notice of his or her claim sufficient to enable it to investigate the claim and (2) place a value on the claim. *Burchfield v. United States*, 168 F.3d 1252, 1255 (11th Cir. 1999). Only "minimal" information is necessary. *Id.* at 1255. "The notice requirement does not require a claimant to enumerate each theory of liability in the claim." *Brown v. United States*, 838 F.2d 1157, 1160 (11th Cir. 1988). But a claim must provide enough information to allow the agency to investigate the claim and respond by either settlement or defense. *Orlando Helicopter Airways v. United States*, 75 F.3d 622, 625 (11th Cir. 1996). Therefore, while an administrative agency cannot "turn a blind eye to facts that become obvious when it investigates" the claim, the agency need not "undertake an independent search for injuries" or search for all facts "in voluminous records

5

. . . if the claimant has not pointed to specific sources of injury." *Burchfield*, 168 F.3d at 1256–57.

### 1. Pre-Death Pain and Suffering

The Court concludes Plaintiff's Form 95 gave adequate notice of the pre-death pain and suffering claim. This conclusion follows from *Brown v. United States*, 838 F.3d 1157 (11th Cir. 1988), where the Eleventh Circuit found that the plaintiff properly exhausted a wrongful death claim, even though his claim to the VA included only allegations of pre-death pain and suffering. In *Brown*, the decedent, Charlie Brown, filed a claim to the VA alleging pain and suffering. 838 F.3d at 1159. After the VA denied his claim, Brown filed suit in federal district court under the FTCA on a claim of medical malpractice. *Id.* Brown died shortly after filing his complaint, and the administrator of his estate, with the district court's leave, amended the complaint to include a wrongful death action. *Id.*

On appeal, the United States argued the district court lacked jurisdiction over the wrongful death cause of action because Brown did not file a wrongful death claim with the VA. *Id.* at 1160. Rejecting this argument, the Eleventh Circuit reasoned that "[a]lthough a Florida wrongful death action is clearly distinct from a personal injury action, liability of a defendant in a wrongful death action is based on the negligent or wrongful act which injuries the decedent." *Id.* at 1161. Thus, "[a] new administrative claim is unnecessary for a wrongful death action because while a different legal injury is suffered, both actions are based on the same injury in fact." *Id.*

Although the facts of this case are arguably the reverse of *Brown*'s, the reasoning in that case guides the Court's analysis. As in *Brown*, while wrongful death and survivorship claims are distinct under Georgia law, *Blackstone v. Blackstone*, 282 Ga. App. 515, 517 (2006), liability will often be based on the same set of facts. Plaintiff's Form 95 listed the time and the general circumstances of death, as well as several witnesses. Plaintiff's claim of medical malpractice, which is evident from the Form 95, underlies the pain and suffering and wrongful death claims. It is thus "hard to imagine what facts . . . could have been included" in the administrative claim "that would have allowed the VA to conduct a more thorough investigation of the claim." *See Burchfield*, 168 F.3d at 1256.

6

**2. Theories of Liability Other Than the Administration of "at Least" 1.5 milligrams of Dilaudid**

The United States also argues Plaintiff failed to notice any claim beyond the administration of a certain dose of Dilaudid. The Court disagrees. A claimant need only provide enough information to "to allow the agency to 'begin its own investigation,'" and need not "recit[e] every possible theory of recovery" or "every factual detail that might be relevant." *Burchfield*, 168 F.3d at 1255. The Form 95 contained sufficient information to notice the VA as to the allegations and theories in her complaint.

*Burchfield v. United States*, 168 F.3d 1252 (11th Cir. 1999), illustrates the point. In that case, Boyd Burchfield developed osteoporosis after doctors at the VA prescribed him a corticosterioid, Prednisone. 168 F.3d at 1253–54. He filed an administrative claim alleging that his use of Prednisone "caused him to develop osteoporosis, resulting in sever and continuing maladies and injuries, including but not limited to the collapse and fracture of several vertebrae and ribs." *Id.* at 1254. He listed thirteen doctors who had treated him. *Id.* In his Complaint, however, Burchfield alleged that osteoporosis was a known effect of corticosteroid treatment and that doctors were negligent in failing to diagnose osteoporosis, in failing to monitor his treatment, and in failing to administer a bone-strengthening regime. *Id.*

The district court found that Burchfield had failed to provide notice of his claims that the VA failed to diagnose or treat osteoporosis. *Id.* The Eleventh Circuit reversed, explaining that the claim need only contain "minimal" information. *Id.* at 1255. Burchfield's claim included "all the essential aspects" of his case—"the time period, the fact that his doctors had prescribed Prednisone, the causal link between his use of Prednisone and his osteoporosis, and the assertion that the VA's agents were negligent." *Id.* at 1256. The claim provided enough information to allow the VA to refer to medical records to investigate the medication and surrounding circumstances. *Id.*

The case at hand is materially indistinguishable from *Burchfield*. The Form 95 in this case contained the date and time of the incident and alleged a causal link to Dilaudid. To investigate the claim, the VA needed to review the same medical records that also show Mixon received multiple pain medications and experienced respiratory depression and low oxygen

saturation. The same medical records indicate medical personnel failed to monitor Mixon immediately after he registered an all-time low pain level of 1.

Nevertheless, the United States contends this case is different from *Burchfield* because the Form 95 and its attached page specifically discuss overdose. According to Defendant, once the VA learned that doctors did not give 1.5 milligrams of Dilaudid within 63 minutes, it was permitted to deny plaintiff's claim without further investigation. That argument is true only if the VA can close its eyes. *Burchfiled*, however, held that "[a]n agency cannot use an overly technical reading of the language of a claim as a reason to turn a blind eye to facts that become obvious when it investigates the alleged events." *Burchfield*, 168 F.3d at 1236. As already explained, by investigating the dosage of Dilaudid, the VA would have come across the other medications and warning signs that Plaintiff alleges contributed to her husband's death.

### B. Expert Issues

Lastly, the United States challenges Plaintiff's expert witness, Dr. Charles Smith. The United States claims Dr. Smith's testimony is inadmissible for two reasons: First, his expert disclosure expanded the theories of liability beyond the Form 95, depriving the Court of jurisdiction over those theories. Second, because Plaintiff did not provide an expert disclosure for Dr. Smith discussing duty of care, breach, or causation, the testimony on those elements should be excluded under Federal Rule of Civil Procedure 37(c). Neither argument is availing.

First, as discussed in more detail previously, Plaintiff's theories of liability—which reflect Dr. Smith's expert opinions—would have been discovered through a reasonable investigation. All of his opinions relate to Mixon's sensitivity to pain medication, the negligent administration of Dilaudid, and the hospital's failure to monitor Mixon during postoperative care. Dr. Smith relied on the same small universe of documents that the VA would have discovered through its investigation of the Form 95. Therefore, for the reasons stated previously, the Court finds this argument unpersuasive.

Second, the Court concludes that exclusion of Dr. Smith's testimony is unwarranted under these facts. Expert reports for "experts retained to provide expert testimony" must

include, among other things, "a complete statement of all opinions the witness will express and the basis and reason for them" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i) & (ii). "'Disclosure of expert testimony' within the meaning of the federal rule contemplates not only the identification of the expert, but also the provision of a written expert report containing 'a complete statement of all opinions' and 'the basis and reasons therefore.'" *Reese v. Herbert*, 527 F.3d 1253, 1265 (11th Cir.2008) (citing Fed. R. Civ. P. 26(a)(2)(B)). The idea is to give "the substance of the testimony which an expert is expected to give on direct examination." *Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998).

Dr. Smith's expert reports met those requirements. The supplemental report in particular included the relevant facts and Dr. Smith's opinion. It opined that sedation and respiratory depression caused oxygen desaturation, ultimately leading to Wyman Mixon's death. It explained that "[a]chieving a pain level of 1 in Mr. Mixon was unnecessary, dangerous and should have been a cause for alarm." Likewise, "[a] pulse oximeter reading of 91% at 20:20 should have also been a cause for alarm since previous readings were 96–100%." Finally, the report listed standard interventions to manage respiratory depression and oversedation.

But even if the report was insufficient, the Court concludes that the failure to provide information was harmless. Under Rule 37, "[i]f a party fails to provide information or identify a witness . . . the party is not allowed to use that . . . witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). To determine whether the failure was substantially justified or harmless, the Eleventh Circuit considers the explanation for the failure to disclose, the importance of the testimony, and the prejudice to the opposing party if the witness is allowed to testify. *Romero v. Drummond Co.*, 552 F.3d 1303, 1321 (11th Cir. 2008); *Lips v. City of Hollywood*, 350 F. App'x 328, 340 (11th Cir. 2009) ("In determining whether the failure to disclose was justified or harmless, we consider the non-disclosing party's explanation for its failure to disclose, the importance of the information, and any prejudice to the opposing party if the information had been admitted."). Although Mixon does not offer an explanation for the alleged failure to disclose— because she contends her disclosures were sufficient—the importance of the testimony and

the lack of prejudice to the Government weigh against exclusion. The testimony is crucial to Mixon's case because it establishes the Government's professional negligence and is the only expert testimony on causation. Moreover, the Government received multiple continuances to locate and prepare a rebuttal witness. It was not prejudiced by any failure to disclose.

### C. Wrongful Death

The FTCA waives the United States' sovereign immunity for torts of government employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). In Georgia, where the Defendant's alleged act or omission occurred, "[a] person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be a tort for which a recovery may be had." O.C.G.A § 51-1-27. A plaintiff suing for medical malpractice must establish (1) the doctor's duty to the patient, (2) the breach of that duty through the failure to exercise the requisite skill and care, (3) and an injury proximately caused by the failure. *Haughton v. Canning*, 287 Ga. App. 28, 28 (2007). Georgia courts recognize a presumption that physicians, nurses, and other medical professionals exercise due care in skill and treatment, and, to overcome the presumption, the plaintiff typically must present expert medical witnesses. *Beach v. Lipham*, 276 Ga. 302, 304 (2003). Furthermore, "an expert's opinion on the issue of whether the defendant's alleged negligence caused the plaintiff's injury cannot be based on speculation or possibility. It must be based on reasonable medical probability or reasonable medical certainty." *Zwiren v. Thompson*, 276 Ga. 498, 503–04 (2003).

### 1. Liability

Based on the record evidence and testimony, the Court concludes Plaintiff has established, by a preponderance of the evidence, that Defendant's agents violated the requisite duty of skill and care. Furthermore, the Court finds there is a reasonable medical probability that Defendant's actions and omissions proximately caused Mixon's death.

10

### a. Duty of Care

The evidence established that Defendant's agents had a duty to intervene and monitor Mixon after he received his last dose of Dilaudid. Dr. Smith testified that Mixon's medical records and history evince sensitivity to pain medication. Because pain medication is known in the medical profession to cause respiratory depression, Defendant's agents had a duty to observe and monitor Mixon and to intervene to improve oxygen saturation.

Mixon's medical records and vital signs available to Defendant's agents show he was at risk of respiratory depression. Mixon twice experienced oxygen desaturation after repeated doses of pain medication. One of these episodes correlated with a low respiratory rate. Mixon's missing kidney and high creatinine levels showed he had poor renal function, meaning that pain medication could accumulate in his system. Mixon's final pain level of 1—which he reported within of a minute of the dosage and well before the drug's peak effect—also should have been a cause for alarm, given his history of chronic pain syndrome. Finally, Nurse El reported that, before his last dose, Mixon appeared pale and needed an incentive spirometer. All of these factors show Mixon was sensitive to pain medication and needed increased monitoring after his last dosage.

Given these risk signs, Dr. Smith testified the standard of care required increased observation. A medical professional could sit at the patient's bedside and talk to the patient. Or the professional could place the patient on a pulse oximeter and observe oxygen saturation. In the event of respiratory depression, medical personnel can intervene by simply arousing the patient, by using bag mask ventilation, or by inserting an advanced airway.

### b. Breach of the Standard of Care

Despite the warning signs, the evidence in this case shows medical professionals did little, if anything, to monitor Mixon and improve his respiratory function after he received his final dosage of Dilaudid. Nurse El admitted she did not check Mixon's vital signs following his last dose of Dilaudid. Nor could she recall monitoring or checking on him. Likewise, Nurse Williams testified he cannot recall monitoring or checking Mixon's vital signs around the time of the last dosage of Dilaudid. A progress note from Nurse Williams indicates he "went back in the room to check on patient to see if pain was relieved, and he responded yes

11

w/ a nod of his head," but it does not indicate when Nurse Williams checked on Mixon or whether he made any other efforts to confirm the patient's well-being. There is no other evidence or testimony in the record that Defendant's agents observed or checked on Mixon after his last dosage of Dilaudid.

### c. Causation

The Court concludes there is a medical probability the pain medication proximately caused Mixon's death. As previously noted, Mixon's medical records show he had sensitivity to pain medication. In the PACU, Mixon's lowest pain score correlated with oxygenation desaturation and a low respiratory rate. Moreover, according to Dr. Smith, Mixon's pain score of 1, which occurred immediately after he received Dilaudid, suggested the pain medication had accumulated in his system. Mixon was found unresponsive thirty to forty-five minutes after receiving Dilaudid, which happens to correlate with its common peak effect times.

Furthermore, although the United States and a few doctors speculated that a pulmonary embolism or acute myocardial infarction could have caused Mixon's death, the evidence failed to support such an inference. An autopsy report, though incomplete, did not report evidence of acute myocardial infarction or pulmonary embolism. Meanwhile, an echocardiogram did not show evidence of right ventricular dysfunction—an indicator of a pulmonary embolism. Similarly, a bilateral lower extremity venous Doppler found no evidence of deep vein thrombosis—a blood clot—which could have caused an embolism. The Government did not provide any expert evidence to suggest beyond speculation that Mixon died from any other cause. And to the contrary, the wealth of evidence supports a finding that pain medication caused Mixon's death within a reasonable degree of medical certainty.

### 2. Damages

Under Georgia law, the plaintiff in a wrongful death suit may recovery the full value of the life of the decedent, without deducting any of the necessary or personal expenses of the decedent had he lived.  The Court concludes Aleta Mixon is entitled to recover $1.2 million for the full value of Mixon's life. As an initial matter, the plaintiff's actuarial table provides a twelve-year life expectancy for a 69-year-old man. And although Mixon experienced

health problems, he also remained active in his later years and attended to those issues. The Court therefore concludes that twelve years is a reasonable estimate of Mixon's life expectancy.

A $1.2 recovery is adequate to compensate the plaintiff for those twelve years of life. As for income, Mixon received $1,535 in monthly Social Benefits, which totals $221,040. In addition to that, Plaintiff requests $748,036.56 for the value of Mixon's household services, assuming sixteen hours a day at $7.25, the current minimum wage, for twelve years. But there was little evidence in the record that Wyman Mixon actually performed sixteen hours' worth of daily household services, particularly given his neck pain and the weakness in his arms. The Court concludes that $200,000 for twelve years more accurately reflects the household work of a retired person with limited flexibility.

Finally, the value of Mixon's final years to him and the cost of his funeral expenses, combined with the figures above, add up to $1.2 million. Without discounting the importance and value of retirement, the Court must consider the fact that Mixon had various health problems and experienced a large amount of pain before his surgery. Although that surgery was uneventful, there was no evidence he would enjoy a pain-free retirement. Yet the evidence also shows he enjoyed his last years, spending time with family and local community organizations. As a result, twelve years of his life is worth at least $700,000.

While Plaintiff is entitled to recover for the full value of Mixon's life, she is not entitle to recover for his pre-death pain and suffering. There is simply no evidence Mixon experienced pain and suffering. Moreover, given that he died from an overdose of pain medication, the contention that he suffered during his death falls flat. Plaintiff certainly did not provide any testimony to that effect.

For those reasons, the Court will enter judgment in the amount of $1.2 million against the Defendant

## IV. CONCLUSION

Having reviewed all of the evidence and briefing, the Court **HEREBY FINDS** in favor of the Plaintiff and against the Defendant. Plaintiff is entitled to $1.2 million in damages. The Clerk of the Court is **ORDERED** to enter judgment in favor of Plaintiff.

**SO ORDERED**, this 30th day of September, 2014

/s/ W. Louis Sands
**W. LOUIS SANDS, JUDGE**
**UNITED STATES DISTRICT COURT**
